1

                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF KENTUCKY
2                            CENTRAL DIVISION
                           LEXINGTON, KENTUCKY
3
UNITED STATES OF AMERICA,          ) Lexington Criminal
4                                  ) Action No. 16-62
        Plaintiff,                 )
5                                  ) At Lexington, Kentucky
-vs-                               )
6                                  ) March 8, 2017
DERIC LOSTUTTER,                   ) 9:00 a.m.
7                                  )
        Defendant.                 )
8

9

10          TRANSCRIPT OF SENTENCING HEARING PROCEEDINGS
              BEFORE THE HONORABLE DANNY C. REEVES
11                 UNITED STATES DISTRICT JUDGE

12

13  Appearances of Counsel:

14  On behalf of Plaintiff:        NEERAJ K. GUPTA, ESQ.
                                   Assistant U.S. Attorney
15                                 260 West Vine Street
                                   Suite 300
16                                 Lexington, Kentucky  40507

17  On behalf of Defendant:        TOR EKELAND, ESQ.
                                   Tor Ekeland P.C.
18                                 195 Plymouth Street
                                   Fifth Floor
19                                 Brooklyn, New York  11201

20  Court Reporter:                PEGGY W. WEBER, RPR
                                   Official Court Reporter
21                                 U.S. District Court
                                   P.O. Box 362
22                                 Lexington, Kentucky  40588
                                   (859) 421-0814
23

24

25  Proceedings recorded by mechanical stenography,
    transcript produced by computer.

1          (Whereupon, the Sentencing Hearing proceedings

2     commenced on March 8, 2017, at 9:00 a.m., on the record

3     in open court, as follows.)

4               THE COURT:  Thank you.

5               Madam Clerk, if you would call the matter

6     scheduled for 9 o'clock, please.

7               THE CLERK:  Yes, Your Honor.

8               Lexington Criminal Action Number 16-62,

9     United States of America versus Deric Lostutter, called

10    for sentencing.

11              THE COURT:  Thank you.

12              If counsel could state their appearances,

13    please.

14              Mr. Gupta, we'll begin with you.

15              MR. GUPTA:  Neeraj Gupta for the United States.

16              With me is Dan Kilbourne and Kevin Brady of the

17    FBI.

18              THE COURT:  All right.  Thank you.

19              MR. EKELAND:  Good morning, Your Honor.

20              Tor Ekeland for Defendant Deric Lostutter, who

21    is present in the courtroom.

22              THE COURT:  All right.  Thank you.

23              This matter is scheduled for a sentencing

24    hearing this morning.

25              Before we proceed with the hearing, let me

                                                                    3

1    first confirm that Mr. Lostutter has had the opportunity

2    to review his presentence report and also to discuss his

3    report with his attorney to his satisfaction.

4               Is that correct?

5               DEFENDANT LOSTUTTER:  Yes, Your Honor.

6               THE COURT:  Mr. Lostutter, your presentence

7    report will be filed in the record under seal.  It is

8    available if you should need it for any reason, or if the

9    attorneys should need it, but it's not available for the

10   general public to review.

11              There is an objection that does affect the

12   guideline calculations in the case.  We'll address that

13   matter first.

14              The objection relates to paragraph 29 of the

15   presentence report, in which there's a two-level

16   increase -- I'm sorry.  There is a two-level increase

17   under that section under 2B1.1(b)(10)(C), but if the

18   resulting offense level is less than 12, then the Court

19   would increase the offense level to a level 12 as the

20   starting point for the analysis.

21              And in this case there is an objection,

22   although, the defendant recommended that particular

23   enhancement at the time that he entered his guilty

24   plea through the plea agreement, but I will give the

25   parties the opportunity to address that matter at this

1 time.

2          MR. EKELAND:  Thank you, Your Honor.

3          Essentially, we're going to rest on the papers,

4 but essentially our point is that the technology in

5 question here, the VPN, is a readily available

6 commercial technology that most corporations and the

7 public use.  It's very easy to use.  It's not a

8 sophisticated means.

9          And we also maintain that simply just changing

10 the domain name server registration for foreign countries

11 is something that's very simple to do, and that anybody

12 with any kind of basic computer skills can do.

13          THE COURT:  What about the fact that you

14 admitted to or recommended this particular increase in

15 the plea agreement that was entered in the matter?

16          MR. EKELAND:  Your Honor, my understanding and

17 my reading of the plea agreement I do believe it

18 explicitly says we can object --

19          THE COURT:  To other sections, to other

20 sections.

21          MR. EKELAND:  -- to the guidelines

22 calculations.

23          THE COURT:  No.  No, that does not say that.

24 Let's go to the specific provision in the plea

25 agreement.

```
 1                And you tell me if I'm reading this
 2  incorrectly.
 3                In paragraph 6, "Pursuant to Rule 11(c)(1)(B),
 4  the United States and defendant recommend the following
 5  sentencing guideline calculations, and they may object to
 6  or argue in favor of other calculations," other than
 7  those that are set forth in paragraph 6, which
 8  specifically in sub-paragraph (c), includes six-level
 9  increase based upon sophisticated means.
10           MR. EKELAND:  Well, Your Honor, it was my
11  understanding when we entered into that agreement that we
12  would be able to argue this sophisticated means, but if
13  the Court believes otherwise, we will --
14           THE COURT:  Well, what does the word "other"
15  mean?
16           MR. EKELAND:  I'm sorry, what?
17           THE COURT:  What does the word "other" mean to
18  you in that paragraph?
19           MR. EKELAND:  Other calculations of the
20  United States Sentencing Guidelines in terms of --
21           THE COURT:  Other than these calculations.
22           MR. EKELAND:  That's not how I read it.  We
23  read it as calculating the recommended guidelines in
24  another way.  That was our understanding when we made the
25  agreement with the --
```

 1          THE COURT:  Paragraph 6 reads, "Pursuant to

 2    Rule 11(c)(1)(B), the United States and defendant

 3    recommend the following sentencing guidelines

 4    calculations."

 5          And what calculations are you referring to

 6    when you say the following sentencing guideline

 7    calculations?

 8          MR. EKELAND:  Your Honor, we're referring to

 9    the calculations as they were put forth in --

10          THE COURT:  Set forth in sub-paragraphs (a)

11    through (g); correct?

12          MR. EKELAND:  Correct, Your Honor, but it's our

13    understanding we -- Your Honor, I think the Court

14    understands our point so we're just going to --

15          THE COURT:  Well, I'm trying to figure out if

16    you're frivolously contesting a point.

17          MR. EKELAND:  No, Your Honor.  It was our

18    understanding that we could object to any of the

19    recommended guidelines calculations, is our

20    understanding.

21          THE COURT:  Well, your understanding is

22    completely contrary to the clear and explicit language in

23    the plea agreement.

24          Let me see what the United States' position is

25    on this issue.

1              MR. GUPTA:  We would just briefly create a

2   record on this.

3              THE COURT:  Yes, sir.

4              MR. GUPTA:  The objections -- the analytical

5   approach used in the defendant's objection is to look at

6   individual acts and assert that those individual acts in

7   isolation aren't sophisticated.

8              The analysis that the probation office uses,

9   the analysis that's in the plea agreement, and the

10  analysis that we'd ask the Court to use is whether the

11  scheme as a whole is sophisticated.

12             The individual acts that they cite to -- that

13  the defendant cites to is in isolation, not being

14  sophisticated, include guessing the password, which isn't

15  always going be to sophisticated individually; using a

16  VPN service, which back in 2009 the Sentencing Commission

17  actually proposed as sophisticated, but it wasn't

18  approved; and other acts such as changing the password to

19  lock the user out, and staging, filming, editing, and

20  uploading a video.  They assert that these individual

21  acts aren't sophisticated.

22             The United States' position is that the scheme

23  as a whole is sophisticated, that this multi-step,

24  multi-day, coordinated multi-person computer hack was

25  sophisticated.

8

1          And then in the United States' sentencing memo,

2    we argue that the concealment of a hack after it took

3    place, also qualifies as -- for this sophisticated means

4    enhancement; the movement of the website to a host

5    offshore in a foreign country.  And, again, the use of

6    virtual private network service.  And that these are

7    analogous to examples of sophistication in the

8    application note.

9          THE COURT:  What is your position on the clear

10   language of the plea agreement?

11         MR. GUPTA:  We do agree that there was an

12   agreement at the time of the plea agreement that the

13   sophisticated means enhancement applies.

14         United States considered that a condition of

15   the plea.  We would not have signed the plea had we not

16   understood that that enhancement -- that we were agreeing

17   to that enhancement.

18         THE COURT:  Of course, it's a nonbinding

19   recommendation, but the parties' position was that they

20   were both recommending the sophisticated means

21   enhancement --

22         MR. GUPTA:  That's right.

23         THE COURT:  -- under this specific section.

24         MR. GUPTA:  That's right.

25         THE COURT:  There's another section that was

1    not incorporated that the parties had recommended.

2              You agree at this point that that would not

3    apply?

4              MR. GUPTA:  I agree with what probation wrote

5    in that response is correct.

6              THE COURT:  All right.  All right.  Thank you.

7              With regard to this objection, which is

8    outlined as objection number 3 in the appendix to the

9    presentence report, I will overrule the objection and

10   adopt the position that has been advocated by the

11   United States, and also has been set forth in writing by

12   the probation office, also find that the defendant's

13   position in filing the objection is clearly contrary to

14   the clear language of the plea agreement, which was only

15   a recommendation to the Court.  It does not bind the

16   Court, and the Court does have to make an independent

17   analysis and evaluation as to whether the enhancement

18   should apply, but it clearly applies in this particular

19   case.

20             The response to the objection as set forth

21   in -- it's listed as objection number 3 in the response.

22   It sets forth the particular section in issue,

23   2B1.1(b)(10)(C).

24             "If the offense involves -- or otherwise

25   involves sophisticated means and the defendant

1  intentionally engaged in or caused the conduct

2  causing the sophisticated -- I'm sorry, constituting

3  sophisticated means, increase by two levels.  If the

4  resulting offense level is less than 12, increase to

5  level 12."

6        Then application note 9(B) provides the

7  following information with respect to sophisticated

8  means.

9        "It means especially complex or especially

10 intricate offense conduct pertaining to the execution or

11 concealment of an offense."

12       And then it also references relevant conduct in

13 Section 1B1.3.

14       Probation officer then states in response to

15 the objection that it's the position of the probation

16 office, and this Court agrees, that Mr. Lostutter's

17 relevant conduct in the instant offense involves

18 sophisticated means with regard to his own individual

19 conduct and the conduct of the co-defendant, Mr. McHugh,

20 that they conspired to commit.

21       Lostutter recruited McHugh in the offense, and

22 they agreed to hack into the webmaster's fan site

23 rollredroll.com.  Defendant sent McHugh messages

24 directing McHugh to gain access to the website with

25 Lostutter's knowledge.  McHugh created an account on the

1   VPN service predator to anonymize Internet activity.

2   Both the defendants -- I'm sorry, both the defendant and

3   McHugh gained unauthorized access to the webmaster's

4   email account, and after gaining access, McHugh publicly

5   posted the webmaster's emails on the website with

6   Lostutter's knowledge.

7           And then with regard to the hacking of the

8   website, McHugh discovered the website was hosted by

9   Hostgator, and McHugh requested a password to reset --

10  that a password reset be sent to the webmaster's email

11  account so that -- that he'd taken over.

12          Lostutter then accessed this account without

13  authorization and changed the user name and password to

14  the webmaster's website, which McHugh provided -- I'm

15  sorry, which Lostutter provided to McHugh.

16          Then once McHugh received the password, he

17  logged into the cPanel for rollredroll.com and uploaded a

18  defacement message and video created by Lostutter.  The

19  defacing page created by the defendant included the

20  video, written statement, and a link to download the

21  webmaster's private emails.  During most of the hack

22  McHugh provided Lostutter with updates on how the hacking

23  was going.

24          McHugh also changed the contact information

25  inside the Hostgator cPanel as indicated to

1    justbatcat@gmail.com.

2         In addition, McHugh changed the DNS setting for

3    the rollredroll.com domain point to a Malaysian company

4    in order to maintain control of the domain.

5         Lostutter was also involved with redirecting

6    the website to a different Internet host.

7         The probation officer takes the position, and

8    the Court agrees, that the actual hack by McHugh and

9    directed by Lostutter in the redirection to a foreign

10   international -- I'm sorry, to a foreign Internet host by

11   the two standing alone supports the sophisticated means

12   enhancement.

13        During the hack the co-defendant devised a

14   method of first hacking the webmaster's email account to

15   gain access to the website.  Once he had access, he was

16   able to request a password reset from the website's host,

17   Hostgator.

18        He and Lostutter then changed the DNS settings

19   for the account to a point to a Malaysian company to

20   maintain control of the domain.

21        And the probation officer indicates that the

22   conduct does fall within the purview of especially

23   complex or especially intricate offense conduct

24   pertaining to the execution or the concealment of the

25   offense, and it would be covered by this particular

13

1    section.

2            And clearly, when the Court takes into account

3    all of the activity and does not attempt to separate each

4    individual act, it clearly would support the enhancement;

5    and, therefore, the objection is overruled.

6            I will adopt the findings that are contained --

7    that is the only objection that does require ruling by

8    the Court, although, there are several other objections

9    that have been noted.

10           I will adopt the findings that are set forth

11   in the report, as well as in the addendum to the

12   reports -- to the report, as well as the guideline

13   calculations.

14           I will review those calculations with the

15   parties at this time.

16           The 2016 edition of the guideline manual has

17   been used, and as indicated the two counts of conviction,

18   Counts 1 and 4, are grouped under 3D1.2.

19           Starting with an offense level -- the base

20   offense level in the case, as reflected in paragraph 29,

21   does become 14 for the reasons that have been just

22   explained.

23           There's also a two-level increase based upon

24   the defendant's position as an organizer, leader,

25   manager, or supervisor, and the Court does find that that

1   two-level increase is applicable based upon

2   Mr. Lostutter's management and supervisory position over

3   the co-defendant in this case, Mr. McHugh.

4              There's a two-level increase for obstruction of

5   justice that results in an offense level of 18 for

6   Count 1.

7              Count 4 has calculations that would result in a

8   lower offense level, but the Court then applies the

9   higher for Count 1 calculations.

10             There's a three-level reduction indicated for

11  acceptance of responsibility.  Before the Court can apply

12  the third level for acceptance of credit, it does require

13  a motion from the United States under Section 3E1.1(b).

14             MR. GUPTA:  We make that motion.

15             THE COURT:  All right.  That motion will be

16  sustained.

17             Upon the three-level reduction for acceptance

18  of responsibility, that reduces the total offense level

19  to a level 15.

20             The defendant has the conviction -- prior

21  conviction noted in paragraph 46.  That does not result

22  in criminal history points being assessed.

23             And, therefore, he's in Criminal History

24  Category I as reflected in paragraph 51, and that has the

25  affect of creating a guideline range of imprisonment in

1    the case of 18 to 24 months.

2              The range for supervision in this matter is a

3    range of one to three years as reflected in

4    paragraph 84.

5              And the fine range in the case based upon those

6    calculations is a range of 4,000 to $40,000.

7              Again, those are the guideline calculations

8    that have been adopted by the Court.

9              I will call the parties' attention to

10   paragraph 97 of the report, which indicates that there

11   may be a basis for departure under 5K2.0(a)(1).

12             And the probation office specifically

13   references that there may be aggravating or mitigating

14   circumstances in the case that would allow the Court to

15   depart from the guideline range.

16             Also, I have received victim impact statements

17   that have been filed by the United States, together with

18   correspondence that it believes would be relevant.

19             I have also received sentencing memorandum

20   filed by the United States, and also a lengthy

21   memorandum filed on behalf of the defendant, which has

22   attached to it a number of materials, including 12 or 13

23   letters.

24             I have received additional correspondence

25   other than the letters that have been filed by the

1    parties.

2              And as a matter of fact, I've received so much

3    correspondence in this case that I have changed the

4    practice that I have typically followed in filing matters

5    in the record at this point.

6              When I receive correspondence, those items of

7    correspondence are being forwarded to the parties so that

8    they can make a determination as to whether they should

9    be filed in the record.

10             I will note that if you want specific ruling

11   with respect to any of those correspondence, you will

12   need to alert me to the specific item and address the

13   matter that you believe would be relevant.

14             Let's see, I believe we may have some counts to

15   be dismissed; is that correct?

16             MR. GUPTA:  Yes, Your Honor.  The United States

17   moves to dismiss Counts 2 and 3 as it reads in the plea

18   agreement.

19             THE COURT:  All right.  That motion will be

20   sustained.  Those counts will be dismissed, effective

21   upon entry of the judgment in the case.

22             All right.  If there are no other motions, we

23   will proceed with allocution in this matter.

24             I'll hear first from Mr. Ekeland and also from

25   Mr. Lostutter if he would like to address the Court.

1          MR. EKELAND:  Thank you, Your Honor.

2          I just rest on my papers, but I believe

3  Mr. Lostutter has a brief statement he would like to

4  make.

5          THE COURT:  All right.  Very well.

6          DEFENDANT LOSTUTTER:  Thank you, Your Honor.

7          I had a giant three-page long statement I wrote

8  to give you, and I'm not going to waste your time with

9  that, just like I wasn't going to waste time with trial,

10  and I admit responsibility for my actions.  I've always

11  admitted responsibility for my actions.

12          I issued an apology to the webmaster in my very

13  first interview I gave whenever I came out to who I was

14  and proffer interview with Agent Chin, and I publicly

15  announced any sort of defamatory content to him.

16          I have tried to put this behind me for the past

17  three years, and I left the state to do so.

18          And to be honest I'm totally terrified of you

19  so I definitely don't want to be back here.

20          But, yeah, so I try to lead a law-abiding life,

21  and I try to help a victim in the matter and, you know,

22  the cover-up narrative that I was telling the media I

23  feel vindicated by -- that that was true with the grand

24  jury impaneled in April of 2013 and the indictment of

25  four and conviction on two, while tampering with evidence

18

1   and contributing to minors.  And that was my main goal

2   was to make sure everything was thoroughly investigated,

3   and I should have left that up to the officials in

4   retrospect.

5          And so I do apologize for wasting this Court's

6   time, and I apologize publicly to the webmaster again,

7   and everyone here.

8          Thank you.

9          THE COURT:  All right.  Thank you.

10          Mr. Gupta?

11          MR. GUPTA:  Well, the United States filed a

12   sentencing memorandum that discusses the 3553(a) factors,

13   but I'll respond briefly to that statement and to the

14   arguments that are in the defendant's sentencing

15   memoranda.

16          The defendant says that he takes

17   responsibility, that he's always accepted responsibility.

18   That's not true.  He's always claimed responsibility, and

19   as part of his plea agreement he accepted legal

20   responsibility.  He's never accepted moral

21   responsibility.

22          He continues to, in his sentencing memorandum,

23   perpetuate this false narrative that he solved the rape,

24   that he exposed a government corrupt cover up, that he

25   prevented media silence.

1          This -- the sentencing memorandum filed by the

2    government actually cites the articles that -- that

3    contain the false narrative that he created.  It is very

4    self-serving for him to continue this claim that he was a

5    white knight, that he was somehow needed to intervene,

6    and that it just happened to be against the law, and

7    therefore he should get leniency.

8          The sentencing memorandum by the United States

9    lays this out, and I think more effectively the victim

10   impact statement by Jane Hanlin that was filed publicly.

11         THE COURT:  Ms. Hanlin testified with the --

12   back to the -- keep referring to the co-defendant,

13   Mr. McHugh.

14         MR. GUPTA:  That's correct.

15         THE COURT:  She testified in that particular

16   matter, and her testimony is essentially summarized in

17   the letter that's been filed as a victim impact

18   statement, and essentially she outlines the prosecution

19   that was taking place beginning in August and then

20   continuing through October and how that was proceeding

21   with the Ohio Attorney General, special prosecutor that

22   had been appointed in the case.

23         And then suddenly Mr. Lostutter and his cohorts

24   become involved in the matter around December 23rd of

25   2012, and it really just complicates things and make

20

1    matters go much worse at that point based upon his

2    interference with the prosecution.

3            Is that a fair summary of her statement?

4            MR. GUPTA:  That's right.

5            THE COURT:  And then she goes beyond that to

6    indicate the pain and injury that was inflicted upon her

7    and on her family by the defendant and his followers,

8    that she -- you know, she had nothing to do with the

9    prosecution following her recusal from the case, but he

10   continued to harass and to attempt to intimidate and

11   injure her and her family, including her son well after

12   the fact.

13           MR. GUPTA:  That's right.

14           And for years after that, including throughout

15   this indictment, after the indictment, and throughout

16   this prosecution, he continues to claim -- he continues

17   to make the claims that she describes in her letter, the

18   claims that not only defame the owner of the website but

19   defame an entire town as being complicit in a cover up of

20   the rape of a child.  And it's just false.

21           The reason I'm emphasizing that is because

22   it's a factor under 3553(a).  There needs to be a

23   punishment that's consistent with the seriousness of

24   this crime.

25           This was a hack of a human person, a person who

1   ran a fan website, and that person for no reason at all

2   was defamed and humiliated.  And their private

3   correspondence, including with third parties, was

4   publicly posted.  That's -- that's a real crime and a

5   real -- has real consequences to a real person.

6           And I'm glad that Mr. Lostutter finally

7   acknowledged that today, but previously he hasn't, and he

8   doesn't in his sentencing memorandum.  Instead, he

9   continues to claim that this was somehow necessary to

10  uncover a rape.  And, of course, that's just not true.

11          Not only was there not a cover-up, it's

12  logically impossible to describe solving a crime that had

13  been solved four months earlier, or preventing a cover-up

14  when there's national news coverage.  That's impossible.

15  But they didn't help this investigation at all.

16          I think Mr. Lostutter also made a comment today

17  about trying to lead a law-abiding life.  We believe that

18  a punishment at the top of the guidelines range is

19  important to emphasize respect for the law.

20          Here the -- Mr. Lostutter seems to think that

21  the 1030(a) -- the 1030 statute is simply a technicality

22  that be evaded whenever he thinks there's a -- some sort

23  of a -- that the ends could justify the means, and that

24  he can just violate this law.

25          And he continued that lack of respect for the

1   law when he lied to the FBI agents during the

2   investigation, and when he committed what the

3   United States considers to be perjury at a pretrial

4   hearing.

5          In Exhibit 3 of the United States sentencing

6   memorandum we attached four Twitter posts or Twitter

7   direct messages.  They weren't posts, they were direct

8   messages.  And that's from the discovery from

9   Deric Lostutter's email account where we were able to

10  pull these direct messages that were sent from the

11  Twitter service to his email.  It's Exhibit 3 of the

12  sentencing memo by the United States.

13         And there's only one-half of the conversation

14  because we don't have Mr. Lostutter's responses, but it

15  shows that during their hack and immediately after their

16  hack these -- these self-proclaimed members of Anonymous

17  didn't think that this was a crime that could have any

18  consequences for them, that they could hide behind their

19  mask, hide behind their screen, hide behind their virtual

20  private network service and cause chaos and havoc in

21  other people's life, but that they themselves would never

22  be punished.

23         So we believe that a sentence at the top of the

24  guidelines range is important to send a general message

25  of deterrence to other computer hackers that this is a

1   real crime with real consequences, including real, real

2   consequences for them.

3            And then finally as to specific deterrence and

4   incapacitation, well, we think the record also supports a

5   sentence at the top of the guidelines range.

6            Mr. Lostutter has not led a law-abiding life.

7   He was indicted, he came to this court, he was told

8   to make -- to keep certain conditions, to keep certain

9   rules as a condition of his release, and he immediately

10  broke them by harassing people that he considered -- some

11  woman he considered to be a witness in this trial, online

12  harassing her.

13           There's a letter that was filed under seal at

14  docket entry 104 that describes a woman -- this is from a

15  woman who he's been harassing and bullying as part of

16  what he considers to be an investigation business or a

17  security business, that as a result of getting fame from

18  this 2012 computer hack, he's now marketed himself as

19  somebody who will cyber bully or shakedown people online

20  for money.

21           And we think that the only way to stop

22  Mr. Lostutter from continued computer bullying and

23  harassment is incapacitation under the guidelines

24  range.

25           And I'll finally address one more thing, which

1  was in the defendant's sentencing memorandum.  And it was

2  the final, I think, six pages of their memorandum, and it

3  describes six cases from the past five or six years, or

4  cherry picked these cases from the last five or six

5  years, when the Court imposed a sentence less than

6  24 months.

7          And it argue -- the inference or the argument

8  is that a sentence within the guidelines range or at the

9  top of the guidelines range would be an unwarranted

10 sentencing disparity.

11         United States responds in two ways.  One, we

12 put a footnote in our own sentencing memorandum that

13 cherry picks six other cases from the last six or seven

14 months where the Court imposed a guideline -- a sentence

15 of imprisonment for just 1030, nothing else.  Here we

16 have, of course, two crimes.  But for just 1030 they

17 imposed a sentence of imprisonment for 24 months or

18 more.

19         We'll also just point out what 3553(a)(6)

20 actually is.  It's about unwarranted sentencing

21 disparities nationwide, and pointing to a single

22 defendant in a different court that was given a downward

23 variance doesn't risk an unwarranted sentencing

24 disparity.  There are too many factors in the sentencing

25 guidelines to make it effective to compare any one

25

1  defendant with every other defendant that has been

2  convicted of that crime.

3       The only way to promote uniformity nationwide

4  is to calculate and give appropriate weight to the

5  sentencing guidelines.

6       And we think that's what the Court should do

7  here, and we recommend a sentence at the top of the

8  sentencing guidelines.

9       THE COURT:  All right.  Thank you.

10       I will address many of the arguments that have

11  been made by the parties.

12       Counsel for the defendant has chosen to stand

13  on his materials, and, of course, it's difficult for the

14  Court to go through all of these materials, and I

15  specifically ask the parties to identify any letters

16  that they would like for me to address.  There have

17  been a couple that the government has pointed out

18  through the victim impact statements, and I will address

19  those.

20       But I have considered all of these other

21  letters that have been submitted, and I have considered

22  the sentencing memorandum filed by the defendant as well,

23  as well as his statements here today.

24       I do begin the analysis of an appropriate

25  sentence from the properly calculated but nonbinding

1   guideline range, and in this particular case when we talk

2   about a term of incarceration, the guideline range is a

3   range of 18 to 24 months.

4          I then take into account all of the relevant

5   factors of Title 18, Section 3553.

6          Let me start from the last argument made by the

7   United States in terms of 3553(a)(6), unwarranted

8   sentencing disparities.  I do want to cite for the

9   parties' benefit a couple of cases that have been decided

10  in this circuit that go to this -- to this very issue,

11  and it's the issue that I often refer to as lowest common

12  denominator.

13         And it's not unusual for a particular defendant

14  to find a case somewhere in the United States, which he

15  or she claims is similar in some nature and some respect

16  to his particular case and then argue that because that

17  defendant received a very low sentence that he should

18  receive that sentence as well.

19         It does not represent a clear cross-section of

20  cases.  It's not statistically significant.  It

21  essentially just means that one judge in some other

22  district in some location, or two or perhaps five, have

23  found for whatever reason to impose a below guideline

24  sentence.  That does not mean that it's in any way

25  relevant to the facts that are presented in the case

1    that's before this Court obviously.

2            And it is impossible, unless this Court has the

3    sentencing memorandum filed in those matters and also has

4    the presentence reports, has the benefit of arguments by

5    the parties and statements in those cases for the Court

6    then to draw proper analogies.

7            And the Sixth Circuit has pointed out the

8    danger in cherry picking cases, which is essentially what

9    the government has asserted has occurred in this

10   particular matter.

11           And we start with the Simmons case, which is

12   often cited.  It's 501 Fed 3d, 620.  I think it's a

13   2007 case from the Sixth Circuit.  I believe that

14   Judge Cornelia Kennedy had written prior to her passing.

15           She points out that, "Section 3553(a)(6) is

16   concerned with national disparities among defendants with

17   similar backgrounds convicted of similar conduct.  It's

18   not a concern with disparities between one individual's

19   sentence and another individual's sentence despite the

20   fact that two may even be co-defendants in a particular

21   case."

22           And she cites a number of jurisdictions that do

23   emphasize the fact that the issue is nationwide

24   sentencing disparities.

25           As a matter of fact, I believe there are only

28

1  two jurisdictions at this point, perhaps three circuits,

2  two or three circuits, that have not followed that

3  specific guidance that 3553(a)(6) concerns itself with,

4  nationwide sentencing disparities.

5          That point is also emphasized in other cases.

6  As a matter of fact, in the Saez case, United States

7  versus Saez, which was is 2006 case, 444 Fed 3d, 15, the

8  Court notes that, "Usually little is to be learned about

9  national uniformity by pointing to the sentence of one

10  other defendant.  Of course, if the same judge sentences

11  two identically situated defendants to substantially

12  different terms, some explanation may be required;

13  uniformity aside, the basic requirement of rationality

14  remains.  But with different judges sentencing two

15  defendants quite differently, there's no reason to think

16  that the first one was right than the second one."

17          And there's also the situation that's even more

18  analogous here where parties had pulled five cases, drug

19  case, and the Court in Thomas, United States versus

20  Thomas, which is a 2010 case, it's unreported, but it

21  appears at 395 Federal Appendix 168.

22          Thomas's -- and the Court states, Thomas's

23  comparison -- it's a case opinion by Judge McKeague.

24  "Thomas's comparison of sentences to those given five

25  random defendants scattered throughout the United States

1   is only marginally relevant; he cannot demonstrate the

2   existence of a national sentencing disparity for

3   street-level dealers sentenced as career offenders by

4   citing five individual district court cases.  In Simmons,

5   we approvingly cited a First Circuit case criticizing

6   exactly this sort of argument.  A single example is about

7   the weakest sort of proof of national practice that can

8   be imagined.  We observed, warning against a sentence in

9   which, quote, weight is given to such singular examples."

10  It cites Simmons and also the Saez case.

11          "As the First Circuit has noted, such

12  comparison between different singular sentences given

13  by different judges opens the door to endless rummaging

14  by lawyers through sentencing in other cases.  Each side

15  finds -- or finding random examples to support higher

16  or lower sentences, as their clients' interests

17  dictate."

18          So the Court does reject the argument that

19  because the defendant has been able to find other cases

20  from other jurisdictions in which a person has been

21  convicted under one of the two counts of conviction in

22  this case that the Court should somehow lower or

23  consider those to be a national average and should

24  somehow adjust the sentence in this particular case,

25  and the Court specifically rejects that approach in

30

1    light of the individual characteristics that should be

2    considered.

3           The Court should consider the need to avoid

4    unwarranted sentencing disparities but is not required to

5    do so by cherry picking those individual cases and giving

6    them undo weight.

7           Likewise, the Court does consider all of the

8    other information contained in the presentence report.

9    It does reflect upon the defendant's history and his

10   characteristics.

11          And in addressing this particular issue, as

12   well as the nature and the circumstances of the offense

13   and the seriousness of the offense, which are matters

14   that are set forth in the sentencing memorandum, I will

15   again refer back to the consequences of the defendant's

16   actions, which really go to his intent and the arguments

17   that have been made here in terms of his acting as a

18   white knight and somehow his actions being noble and

19   necessary in order to uncover some type of a cover up of

20   a matter that would not otherwise be prosecuted.

21          And it would appear based upon all of the

22   information provided that that's not the case, that this

23   defendant it was not necessary that he intervene in this

24   matter for any legitimate reason.

25          Instead, it appears to the Court that he has

31

1   acted as some type of shakedown artist or some type of a

2   cyber bully.  He feels like that that has become his

3   profession perhaps, that he can gain fame or fortune in

4   that way.  But he certainly was not a white knight in

5   this particular matter, and again I turn to the victim

6   impact statement that was filed by the former

7   prosecutor, Jane Hanlin, which appears at docket entry

8   102 in the case, and it describes the type of

9   consequences that occurred as a result of the

10  defendant's actions here.

11          Earlier I had summarized in terms of a timeline

12  the prosecution in the case that clearly indicates that

13  the underlying rape matter was being investigated,

14  prosecuted, and the convictions were moving forward

15  before the defendant either was aware of this or became

16  involved.

17          But once again, he made matters much worse.

18  And turning to page 3 of the victim impact statement, I'm

19  going to read a portion of this because I believe it's

20  clearly relevant to this case, and it clearly

21  demonstrates the type of damage that this defendant has

22  done.

23          Ms. Hanlin states, "It would be impossible to

24  describe the terror experienced by the citizens of

25  Steubenville as the videos began to infiltrate homes of

1    hundreds, if not thousands, of people.  The threat that

2    people's children would be harmed and that their most

3    personal information would be divulged and that something

4    heretofore unknown in Steubenville, the Hive of

5    Anonymous, would be invading our town.

6           "To say that the actions of Mr. Lostutter were

7    unnecessary would be a gross understatement.  Absolutely

8    everything that could be done to solve the crime had been

9    done in August 2012.  The matter had been fully

10   investigated, appropriately -- appropriate charges had

11   been filed, and the Attorney General of the State of Ohio

12   publicly stated that there was no cover up of any sort.

13   The case was receiving more than adequate coverage in the

14   press.  And yet, Mr. Lostutter took it upon himself to

15   invade our town, threaten our young people, and ignite an

16   international firestorm.

17          "What happened in the City of Steubenville

18   after Mr. Lostutter began his criminal activity is hard

19   to describe to anyone who is not on the ground to witness

20   it.  His actions ignited protests, hundreds of unknown

21   masked individuals parading through our town, thousands

22   and thousands of death threats were issued via e-mail and

23   telephone message, facsimile, anonymous letters,

24   virtually every form of communication was used to

25   threaten and terrify the people of Steubenville.

33

1          "One of the most damaging effects of

2  Mr. Lostutter's actions is that the narrative that he

3  pushed through local and national and international media

4  was entirely false.  The narrative promulgated by

5  Mr. Lostutter involved a false story that multiple star

6  football players repeatedly raped a girl in Steubenville

7  at multiple parties, that the victim was transported from

8  party to party in the trunk of a car, while dozens of

9  onlookers watched and did nothing.  The problem with that

10  narrative is that it is false."

11          She goes on to describe what actually happened.

12          And then she states that, "One of the other

13  unfortunate effects of Mr. Lostutter's involvement was

14  the fear and hate that he was spreading throughout -- or

15  through these false theories resulting in witnesses being

16  frightened, intimidated, and afraid to cooperate with

17  local law enforcement officials.  Up until the point that

18  Lostutter arrived, local law enforcement had received

19  near complete cooperation from witnesses.  After

20  Lostutter incited so much hate and fear, families were

21  afraid to allow their children to cooperate.  Thus,

22  Lostutter did not help the matter, he actually hurt the

23  prosecution's efforts."

24          Then she goes on to describe how this affected

25  her family.  She states that, "My family and I were

34

personally and relentlessly attacked and targeted for violence."

She explains how her son had been accepted into -- as a student athlete at Kent State University and how he was viciously attacked by others online and through various forms of media.  Anonymous attackers cheered for her son to be burned alive, and she goes on to describe some of the other threats and statements that were made, which she attributes to Mr. Lostutter and the Internet vigilantes that he had assembled.

She goes on for several pages, but she indicates at page 5, and I agree with this summary. "I'm quite certain that Mr. Lostutter's actions were based upon greed, an undying need for attention, and his willingness to harm anybody who attempted to point out the truth of what had actually occurred in the city."

I've reviewed this letter in some detail because I do believe that it correctly indicates that the prosecution was, in fact, occurring, that Mr. Lostutter's actions were not necessary.  They made matters worse, and they harmed a number of other individuals.

He indicates that in his statement to the Court just a few moments ago that he had actually left this area, and he was leading a law-abiding life, but then

35

1    when we look at some of the other letters that were

2    filed, victim impact letters, one that was filed under

3    seal that was referenced by the United States, it appears

4    that he continues to engage in this type of Internet

5    battle pretty much anywhere he goes.

6            And, again, that reinforces my conclusion that

7    really he's attempting to become known as a -- as a

8    shakedown artist, as a cyber bully, and his actions in

9    this particular case and then his actions thereafter

10   would support that particular determination.

11           When I look at the factors of 3553, I mentioned

12   several of them.  I've mentioned the defendant's history

13   and characteristics.  Some of those characteristics are

14   outlined in the sentencing memorandum that has been filed

15   in this matter, beginning at page 3 going through page 7

16   or 8.

17           History and characteristics of the defendant

18   and those matters that occurred during his childhood and

19   adolescence have little or no bearing on the matter

20   that's -- for which he stands convicted in this

21   particular court.

22           I will note though that one of the matters that

23   troubles me somewhat in the memorandum and then in the

24   position that he's taken is that somehow he's a victim of

25   PTSD as a result of the warrants and the arrests that

36

1    occurred in this particular case because of his

2    interaction with the agents of the Federal Bureau of

3    Investigation.

4                He's attempting to become a victim once again

5    when, in fact, the officers were conducting an

6    appropriate search.  There's nothing improper about the

7    search that was performed.  And for this defendant to

8    then attempt to turn around and say that he's a victim

9    and is now suffering from this -- from this illness is --

10   is -- is not well-founded.

11               When we look at the seriousness of the offense,

12   I've attempted to highlight some of that by reading this

13   letter from the prosecutor in Ohio.  I do believe that

14   it's serious.  It's more serious than the defendant

15   credits it.

16               He references the fact that he is sorry he has

17   taken the Court's time, but that's what this Court is

18   here for.  This Court is here to address serious

19   violations of the criminal laws of the United States, and

20   there are two here.

21               The memorandum focuses primarily on Count 1 and

22   does not give much thought to Count 4, but that's also a

23   very serious count of conviction, which does certainly

24   deserve punishment.

25               It is in the Court's opinion necessary to

1    impose a term of incarceration in order to provide not

2    only specific deterrence for this defendant but other --

3    but deterrence for other individuals that might be

4    inclined to commit a similar offense.

5              An argument could be made that perhaps in these

6    other cases that have been cited had the Court taken a

7    stronger position in imposing a term of incarceration

8    that other individuals such as Mr. Lostutter would not

9    ignore the law and be willing to engage in criminal

10   activity.

11             I don't make any conclusions in that regard but

12   do point out that that is an argument that certainly can

13   be made in support of specific deterrence in this

14   particular matter.

15             But notwithstanding these other cases, the

16   Court believes that a term of incarceration along the

17   lines that has been suggested by the United States would

18   be appropriate and necessary in this particular case, not

19   only to provide specific deterrence but also general

20   deterrence and to protect the public.

21             I'm not unmindful of the fact that there's also

22   rehabilitative aspect of sentencing.  3553(a)(2)(D) does

23   indicate that the Court should provide the defendant with

24   needed educational or vocational training, medical care

25   or other corrective treatment.

38

1          Because I believe that it is necessary to
2    impose limitations on the defendant's Internet and
3    computer activities as a condition of supervision, I am
4    going to recommend that he receive vocational training
5    during the period of incarceration that will be imposed
6    in this case.
7          Also, there is an indication of some substance
8    abuse in his past, particularly with alcohol, and I will
9    be including some conditions for substance abuse
10   treatment, and also require that he abstain from the use
11   of alcohol as a condition of his supervision.
12         Again, I have considered the issue of
13   unwarranted sentencing disparities and do not believe
14   that a sentence within the guidelines in this particular
15   matter would be an unwarranted sentencing disparity.
16         Instead, I do conclude that when I consider all
17   of the factors of 3553, as well as the information that
18   has been provided to the Court in writing, as well as --
19   that has been argued here today, that a term of
20   incarceration at the top of the guidelines is absolutely
21   necessary in this particular matter.
22             And I will announce the sentence at this time.
23             And it will be the sentence of this Court,
24   pursuant to the Sentencing Reform Act of 1984, as
25   modified by the decisions in Booker and Fanfan, and I do

39

1    find that the following sentence would be sufficient but

2    not greater than necessary to meet the purposes of

3    Title 18, Section 3553(a).

4              And, therefore, it will be the judgment of the

5    Court that the defendant Deric Lostutter will be

6    committed to the custody of the Bureau of Prisons for a

7    term of 24 months on each Count 1 and 4, to run

8    concurrently, to produce a total term of incarceration of

9    24 months.

10             As I just indicated, I will recommend to the

11   Bureau of Prisons that he participate in a job skills and

12   vocational training program.

13             I'll recommend that he participate in the

14   Substance Abuse Treatment Program and also that he

15   participate in a program for mental health treatment

16   during the period of incarceration.

17             Upon release, he'll be placed upon supervised

18   release for a term of three years on each count, to run

19   concurrently, to produce a total term of supervision of

20   three years.

21             And within 72 hours of release from the custody

22   of the Bureau of Prisons he shall report in person to

23   the probation office in the district in which he is

24   released.

25             While on supervised release, the defendant may

1   not commit another federal, state, or local crime.

2           He must comply with the mandatory and standard

3   conditions that will be set forth in the judgment and

4   commitment order that have been adopted by the Court,

5   and he must comply with the following additional

6   conditions.

7           And they include that he not possess a firearm,

8   destructive device, ammunition, or a dangerous weapon.

9           He must refrain from any unlawful use of a

10  controlled substance and submit to one drug test within

11  15 days of release, and at least two periodic drug tests

12  thereafter.

13          I'll also include the following special

14  conditions, and they include that he abstain from the use

15  of alcohol, that he participate in a Substance Abuse

16  Treatment Program, and submit to periodic drug and

17  alcohol testing at the direction and discretion of the

18  probation office during the term of supervision.

19          Now, that program may include one or more

20  cognitive behavioral approaches to address criminal

21  thinking patterns and antisocial behaviors.

22          He will be required to pay the cost of

23  treatment services to the extent that he's able to do so

24  as determined by the probation office.

25          He will be required to refrain from engaging in

41

1  employment in the information technology field during the

2  term of supervision, pursuant to Section 5F1.5 of the

3  sentencing guidelines, again, for the reasons that have

4  been outlined as I've explained the rationale for the

5  sentence that is being imposed in the case.

6          He must refrain from obstructing or attempting

7  to obstruct or tamper in any fashion with the efficiency

8  and accuracy of any prohibited substance testing, which

9  is required as a condition of release.

10         He must attend and successfully complete any

11  mental health diagnostic evaluations and treatment or

12  counseling programs as directed by the probation office.

13         Again, he'll be required to pay the cost of

14  those treatment services but only to the extent that he's

15  able to do so as determined by the probation office.

16         And I will be imposing a fine in this case, and

17  so, therefore, I will include some conditions with

18  respect to some financial conditions with respect to

19  the -- with this matter.

20         Now, the defendant may not incur any new credit

21  charges or open additional lines of credit without the

22  approval of the probation office unless he's in

23  compliance with an installment payment schedule.

24         He will be required to provide the probation

25  office with access to any requested financial

42

information.

He may not purchase, use, distribute, or administer any controlled substance or paraphernalia related to controlled substances, except as prescribed by a physician, and may not frequent places where controlled substances are illegally sold, used, distributed, or administered.

He may not possess or use a computer or any device with access to any online computer service at any location, including place of employment, without the prior approval of the probation office.  This includes any Internet service provider, bulletin board system, or any other public or private network, or email system.

He must consent to the probation office conducting unannounced examinations of his computer system and any internal or external storage devices, which may include retrieval and copying of all memory from the hardware and software and/or the removal of such systems for the purpose of conducting a more thorough inspection.

And he must consent to having installed on his computer any hardware or software to monitor his computer use or to prevent access to particular materials, and to consent to periodic inspections of such installed hardware and software to ensure it is functioning

43

1    properly.

2          He will also be required to provide the

3    probation office with accurate information about his

4    entire computer system, and that would include the

5    hardware and software, any internal or external storage

6    devices and must provide all passwords used by him.

7          And he must abide by all rules of the computer

8    restriction and monitoring programming.

9          There's another provision that I will include

10   that was outlined in the second addendum to the

11   presentence report.

12         The defendant shall not communicate or attempt

13   to communicate, either directly or indirectly, in any

14   form, to include through Internet websites or services,

15   any message, content, information, or other communication

16   that has the purpose or intent to be threatening,

17   harassing, or intimidating to another individual.  I will

18   include the individual's family, or corporation, or

19   organization.

20         Threatening, harassing, or intimidating

21   communications include any communication that has the

22   intent to inflict punishment, loss, pain, or damage to

23   another individual, the individual's family, corporation,

24   or organization; or the individuals, the individuals'

25   family, or the corporation, or organization's property

44

 1   that is meant to cause distress or alarm to an

 2   individual, an individual's family, corporation, or

 3   organization; or is meant to coerce into action or place

 4   under duress, whether it be emotionally, physically, or

 5   financially any individual, any individual's family, or

 6   corporation, or organization.

 7            Now, based upon the defendant's current

 8   financial situation, I will impose a fine at the bottom

 9   of the fine range of $5,000.

10            And he will be ordered to pay a special

11   assessment of $200, which is $100 per count of

12   conviction.

13            In determining the fine in the case and, quite

14   frankly, also in determining the sentence, I have

15   considered the impact of a fine and the sentence upon the

16   defendant's family.  I do not believe that family ties or

17   circumstances under the guidelines would be a reason to

18   depart from the range as indicated, but I have considered

19   that issue.

20            But I have determined that to impose a higher

21   fine amount in the case, higher than $4,000, would create

22   an undo hardship on the family and, therefore, I've

23   limited the fine to the bottom of the range.

24            The defendant will also be required to forfeit

25   to the United States all interest in property used or

45

```
 1   intended to be used to commit and facilitate the

 2   commission of the offense as charged in the indictment,

 3   and that forfeiture will be pursuant to Title 18 of the

 4   United States Code, Section 1030(i)(1)(A).

 5           I will allow the defendant to report,

 6   self-report, to the institution designated by the Bureau

 7   of Prisons, but the report date will be not later than

 8   2:00 p.m. on May 8th, 2017.

 9           And that will be the judgment of the Court.

10           In just a moment I will ask -- well, I

11   believe -- I was going to say I will ask the clerk to

12   advise the defendant of his right of appeal, but my

13   recollection is that there's a limited waiver that was

14   agreed upon in this particular case, and the defendant

15   agreed that unless he was -- a sentence was imposed in

16   excess of the guideline range, the properly calculated

17   guideline range as determined by the Court at the time of

18   sentencing, that he would waive his right to appeal the

19   sentence imposed in the case.

20           That's correct, paragraph 9.  So I'm not going

21   to ask the clerk to advise the defendant of any rights of

22   appeal.

23           But I will note for the record that in the

24   event that either party believes that this Court has

25   committed any error that would not be subject to the
```

46

1    waiver and would be subject to appeal, that any notice of

2    appeal would have to be filed within 14 days of entry of

3    the judgment to be timely filed.

4              Also, in the event the defendant believes that

5    there were issues that were not subject to the waiver and

6    would be subject to proper appeal, he could seek to

7    appeal in forma pauperis, which means he could seek to

8    appeal without payment or cost, and could also seek to

9    have counsel appointed to represent him without payment

10   or cost if he were able to establish that he could not

11   afford to pay the cost of an appeal or of an attorney.

12             Now, at this time I'll entertain any objections

13   that the parties have.  There are three questions I will

14   present to the parties.

15             First would be any objections to the sentence,

16   or any conditions of supervision that have been

17   announced.

18             Next would be any objections under

19   United States versus Bostic.  Under that decision from

20   the Sixth Circuit any objections not previously raised

21   would need to be raised at this time so that they may be

22   addressed by the Court to be properly preserved for

23   review on appeal.

24             And then, finally, if the parties would like

25   the Court to make additional findings to support the

1  sentence that has been announced, I will be happy to make

2  additional findings.

3           Mr. Gupta, I'll begin with the United States.

4           MR. GUPTA:  Nothing to add, no objections.

5           THE COURT:  All right.  Thank you.

6           Mr. Ekeland.

7           MR. EKELAND:  No objections, Your Honor.  We

8  just would ask the Court, if it so pleases the Court, to

9  recommend to the Bureau of Prisons that Mr. Lostutter be

10 designated to the facility in Butner, which is in Durham,

11 North Carolina, so he can be near his family.

12          THE COURT:  All right.  I will include a

13 recommendation that the defendant serve a period of

14 incarceration at the location closest to Durham,

15 North Carolina, for which he would qualify.

16          MR. EKELAND:  Thank you, Your Honor.

17          THE COURT:  All right.  Thank you.

18          Are there any other issues that need to be

19 taken up in the case?

20          Anything by the government?

21          MR. GUPTA:  Nothing.  Thank you.

22          THE COURT:  Anything on behalf of the

23 defendant?

24          MR. EKELAND:  No, Your Honor.

25          THE COURT:  All right.  Thank you.

1            If not, we'll take about a two-minute recess

2   before the next matter is called.

3       (Whereupon, the Sentencing Hearing proceedings

4   concluded at 10:00 a.m.)

5                     C E R T I F I C A T E

6       I, Peggy W. Weber, certify that the foregoing is a

7   correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10
    March 31, 2017                    s/Peggy W. Weber
11      DATE                          PEGGY W. WEBER, RPR

12

13

14

15

16

17

18

19

20

21

22

23

24

25